UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(2) ANTHONY BAEZ,<br><br>Defendant | Criminal No. 19-cr-40049-TSHs |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant United States Attorney, respectfully submits this sentencing memorandum in connection with the sentencing of defendant Anthony Baez (hereinafter, the "Defendant").   On July 29, 2020, the Defendant pled guilty to Counts 1-7 of the Superseding Indictment.[1]   There is no plea agreement in this case.

As detailed in the final Pre-Sentence Report ("PSR"), the Defendant is responsible for the distribution of over 1.67 kilograms of a fentanyl and heroin mixture, at least 1.5 kilograms of cocaine, and at least 10 grams of cocaine base, or crack cocaine.   PSR ¶ 57.   The Defendant was not selling these serious narcotics to support his own habit.   Rather, the Defendant was a businessman who capitalized off of the addiction of others and profited from their pain.   A significant sentence is therefore necessary and warranted both to punish this defendant and to dissuade others from continuing to distribute these lethal drugs.

Given the facts of this case, and the Defendant's background and role in the drug trafficking organization ("DTO"), the Government recommends that the Court sentence him to the low-end

---

[1] The Defendant is not named in Count 8 of the Superseding Indictment.

of the guideline sentencing range ("GSR") as calculated by United States Probation—that is, 188 months of imprisonment, five years of supervised release, and a $700 special assessment.

## I.      BACKGROUND OF THE CASE

In September 2018, the FBI Boston Strike Force began an investigation following a fatal overdose.   PSR ¶ 9.   The victim's autopsy report indicates that he died from acute fentanyl and heroin intoxication.   *Id.*   Text messages found on the victim's phone led agents to identify an individual who the victim contacted to purchase drugs just before his fatal overdose.   *Id.*   That individual agreed to cooperate with law enforcement and advised that the heroin that caused the victim's death was sold by Pedro Baez (hereinafter, "Pedro").   *Id.*

The investigation revealed that Pedro led a drug trafficking organization or "DTO" in the Fitchburg, Massachusetts area.   PSR ¶ 10.   Pedro was responsible for distributing a heroin and fentanyl mixture, cocaine, and crack cocaine to approximately 20 customers throughout the Fitchburg area.   *Id.*   Most of the customers were drug users, but many of the customers resold all, or a portion, of the drugs they bought from the DTO to their own customers.   *Id.*   In the course of the investigation, agents learned that Pedro led the DTO in coordination with his son, Anthony Baez, the Defendant.   *Id.*

Through the course of the investigation, agents learned that the Defendant obtained narcotics directly from Pedro, or from suppliers that both he and Pedro used.   *Id.*   The Defendant had his own drug customers, but there were some customers that both he and Pedro sold drugs to. *Id.*   The Defendant worked directly with Monica Troche (hereinafter, "Troche") to store, package, and distribute narcotics.   *Id.*   The Defendant used Troche to drive him to drug deals.   In addition, Troche often sold drugs at the Defendant's direction or independently to customers of her own.

*Id.*

Beginning in July 2019, United States District Judges for the District of Massachusetts authorized interception of wire and electronic communications to and from telephones used by the Defendant, Pedro, and other members of the DTO and its suppliers.   PSR ¶ 11.   Based on those interceptions, the Defendant had multiple regular crack cocaine and heroin customers, some of whom were also street-level dealers.

Over the course of the investigation leading up to the Defendant's arrest, agents utilized three cooperating witnesses or "CWs" to conduct 12 controlled purchases of narcotics from members of the DTO.   The controlled purchases, which are set forth in detail in the PSR, resulted in the seizure of approximately 1.6 kilograms of a heroin and fentanyl mixture, a kilogram of cocaine, and 10 grams of crack cocaine.   PSR ¶¶ 14-46.   With the exception of the first controlled purchase of 2.5 grams of a heroin and fentanyl mixture, the Defendant personally delivered, or directly ordered Troche to deliver narcotics to cooperating witnesses.   *Id.*   In addition to the controlled purchases, agents executed search warrants at the time of the Defendant's arrest and seized an additional 227 grams of a fentanyl and heroin mixture, as well as approximately 14 grams of cocaine.   PSR ¶¶ 50-51.[2]

## II.   ADVISORY SENTENCING GUIDELINES

The Government agrees with the PSR's calculations of the Defendant's offense level and

---

[2] Throughout the investigation, the Defendant kept his supply of narcotics either at Pedro's residence—where he also resided at times—or Troche's residence.   On the day that the Defendant, Pedro, and Troche were arrested, agents seized approximately 59 grams of a fentanyl and heroin mixture from Troche's residence and approximately 168.7 grams of a fentanyl and heroin mixture, as well as approximately 13.8 grams of cocaine from Pedro's residence. PSR ¶ 51.   As noted in the PSR, Pedro admitted to flushing 500 grams of cocaine when he saw the agents coming; the 13.8 grams was the amount agents were able to recover from the scene.   *Id.*   Pedro acquired the 500 grams of cocaine on behalf of the Defendant in anticipation of another controlled purchase with CW-2 and CW-3.   PSR ¶¶ 47-48.

criminal history category.   The Defendant is responsible for over 1.67 kilograms of a deadly fentanyl and heroin mixture, at least 1.5 kilograms of powder cocaine, and at least 10 grams of cocaine base, or crack cocaine.   PSR ¶ 57.   The drug weight calculated in the PSR includes only *seized* drugs, however, as noted above, agents intercepted two of the Defendant's telephones for a total of sixty days.   The interceptions indicate that, in addition to the seizures, the Defendant had multiple regular drug customers to whom he sold a fentanyl and heroin mixture, as well as crack and powder cocaine.   As such, it is fair to say that the above numbers are a conservative representation of what the Defendant is actually responsible for.

The Defendant's base offense level is 32.   PSR ¶ 58.   Based on the size of the DTO, the extensive nature of the criminal activity, as well as his role in the conduct, a three-level increase is warranted.   PSR ¶ 61; *see also* United States Sentencing Guidelines, § 3B1.1(b).   The Defendant objects to the three-level increase for his role in the criminal activity.   *See* Defendant's Sentencing Memorandum, Dkt. 263.   He claims that he did not manage or supervise any other individuals, however, he can offer no evidence to support that claim.   On the contrary, this case is replete with facts supporting the upward adjustment.

The enhancement under § 3B1.1(b) has two elements: (1) that the defendant manage or supervise at least one person in the covered activity; and (2) that the criminal activity involved five or more participants or was otherwise extensive.   *See* USSG § 3B1.1(b) ("If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels"); *see also United States v. Nunez*, 840 F.3d 1, 5 (1st Cir. 2016).   The Defendant does not appear to contest the second element; nor could he.   The criminal activity in this case indisputably involved five or more

participants, as is evident by the Superseding Indictment, which charges a total of eighteen people, including eight people in the conspiracy count to which the Defendant already pleaded guilty.

With respect to the first element, "the aggravating role adjustment described in section 3B1.1(b) requires *only* that a defendant manage *one* other participant in the covered activity." *United States v. Garcia-Hernandez*, 659 F.3d 108, 115 (1st Cir. 2011) (emphasis added).   As described in the PSR, the Defendant acted as a manager or supervisor over at least one individual, his co-defendant and co-conspirator Monica Troche.   PSR ¶ 61.   The Defendant's claim that Troche worked with him "in a collaborative or collective endeavor" (Dkt. 263) and that he did not manage or supervise her, is without factual support.   On the contrary, throughout the investigation the evidence is clear that the Defendant managed or supervised Troche in multiple activities related to the offense. At the direction of the Defendant, Troche delivered drugs to the Defendant's customers on his behalf and collected the drug proceeds from those transactions.   At the direction of the Defendant, Troche stored and packaged drugs on behalf of the Defendant.   Finally, Troche acted as a lookout, and drove the Defendant to multiple drug transactions.   Each of these activities support a finding that the Defendant acted as a manager or supervisor over Troche.

First, the Defendant directed Troche to deliver narcotics to his customers on his behalf. The PSR includes one such example.   On July 23, 2019, the Defendant directed one of his regular customers Valerie Lucier (hereinafter, "Lucier") to call Troche if Lucier wanted to get something at night.   The Defendant told Lucier that he would instruct Troche how much to give her and how much to charge her for the drugs.   PSR, fn. 1.   That is but one of many examples.   On August 15, 2019, agents intercepted another call between the Defendant and one of his drug customers, during which he told the customer that he would leave the drugs with "M" (Troche).   Following

that call, agents intercepted a call between the Defendant and Troche, during which he told her that the customer would pick up the drugs from her, then come meet with the Defendant to pay him ("I told him to go there first, grab the shit, and then come give me the money he owes me and the money for that.").   On August 23, 2019, agents intercepted a call during which the Defendant instructed Troche to bring "two gs" (or two grams) to "Pablo over at the garage" on his behalf. The Defendant directed Troche to "put it in one bag and give it to him like that."   He further instructed Troche to get "the white" "the white girl," which is a reference to cocaine.   The Defendant specifically directed Troche which stash of drugs to take the two grams from and told her "don't touch that other shit; I'll touch it when I'm there."   In addition to instructing her how much to get, which stash to get it from, the Defendant also explicitly directed Troche how to deliver the drugs to "Pablo."   He told her to "be lowkey."   Similarly, on September 1, 2019, the Defendant directed Troche to bring "two" (or two grams) to a female customer.   Troche confirmed, "two of white," (two grams of cocaine) and agreed.   On September 4, 2019, the Defendant told Troche that he was going to "set her up" with "some hard" because he had customers calling him for it.   The word "hard" is commonly used in the drug trade to refer to crack cocaine.   When the Defendant told Troche that he would "set her up" he meant that he would supply her with crack cocaine for her to distribute to his customers on his behalf.   On September 5, 2019, agents intercepted a call during which Troche told the Defendant that she sold "2.5" to a customer and that she had the "paper" for him.   That indicates that she made a drug sale ("2.5" grams) on the Defendant's behalf and had money ("paper") from the deal to give to the Defendant.   Similarly, on September 6, 2019, the Defendant asked Troche if "this clown" (a customer) went to see her.   Troche confirmed that she met with the customer and she told the

Defendant that she left the "300 bucks" on the counter for him.   On September 20, 2019, the Defendant and Troche discussed how the Defendant was planning to "set [her] up with more shit," and how the Defendant had "a few more people to set" her up with.

Second, the Defendant also stored some of his narcotics at Troche's residence and directed her to package certain amounts of various narcotics for him.   For example, on August 8, 2019, agents intercepted a call between the Defendant and Troche, during which the Defendant told Troche that he had to "see a couple other people" and he asked her to "make that up" for him.   He went on to tell her that he would come to "scoop up the gram."   Similarly, on August 15, 2019, agents intercepted another call between the Defendant and Troche during which he told her he would come to her house to pick up narcotics.   On August 30, 2019, the Defendant called Troche and directed her to put aside a "ball" for him.   Troche asked him, "how many grams is that," which indicates that she is not well-versed in the drug trade, and the Defendant responded, "three point five."   Another example is from September 27, 2019, when the Defendant called Troche and directed her to stay at her house and to "bag up six grams" for him.

Third, as noted throughout the PSR, the Defendant directed Troche to assist him in connection with five of the controlled purchases.   On May 10, 2019, the Defendant directed Troche deliver 50 grams of a fentanyl and heroin mixture to CW-2.   PSR ¶¶ 28-30.   Troche also drove the Defendant to meet with CW-2 for the controlled purchases of fentanyl on May 31, July 17, and August 21, 2019.   PSR ¶¶ 31-40.   During the May and July deals, Troche appeared to be acting as a lookout for the Defendant while he completed the transactions with CW-2.   When the Defendant met with CW-2 during the July 2019 deal, he told CW-2 that he had "girls" who drive him.   PSR ¶ 36.   On September 24, 2019, Troche drove the Defendant to the deal with CW-2 and

CW-3, during which the Defendant sold the CWs 500 grams of a fentanyl and heroin mixture, as well as 500 grams of cocaine.   PSR ¶¶ 41-44.   Agents intercepted numerous calls setting up that deal, including calls during which the Defendant talked to Troche about having her drive him to the deal and paying her to do so.   During that controlled purchase, while discussing his drug business with the CWs, the Defendant referred to Troche was one of his "runners."   PSR ¶¶ 36 and 43.   All of these examples make it clear that the Defendant was acting as a manager or supervisor over at least a portion of Troche's drug activities.

In addition to Troche, during the investigation the Defendant repeatedly discussed having people who worked for him.   For example, during the May 1, 2019 controlled purchase, the Defendant told CW-2 that he had someone who "tested" his heroin for him.   PSR ¶ 26.   During the controlled purchase with CW-2 on July 17, 2019, the Defendant told CW-2 about how he had other people working for him to conduct the smaller deals.   The Defendant stated, "I don't really deal with a little bit.   I have other people doing that for me.   I deal with big shit, the bigger shit."   PSR ¶ 34.   As noted above, during that meeting, the Defendant told CW-2 that he had "girls" who drive him.   Based on all of the evidence, the upward adjustment of three levels for a leadership role is warranted.

Although the terms "manager" and "supervisor" are not defined in the Sentencing Guidelines, the terms are described in U.S.S.G. § 3B1.1 cmt.4 as involving:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*See* U.S.S.G. § 3B1.1 cmt.4.   The First Circuit has recognized that "[m]anagerial status generally attaches if there is evidence that a defendant, in committing the crime, exercised control over, or was otherwise responsible for overseeing the activities of, at least one other person."   *United States v. Cali*, 87 F.3d 571, 578 (1st Cir. 1996).

"In a drug distribution case such as this one, the management enhancement is appropriate for a defendant who arranges drug transactions, negotiates sales with others, and hires others to work for the conspiracy."   *United States v. Roberts*, 215 Fed. Appx. 842, 847 (11th Cir. 2007). "The evidence supporting the defendant's role in the offense may be wholly circumstantial and the government need only prove that the defendant exercised authority or control over another participant on one occasion."   *United States v. Garcia-Morales,* 382 F.3d 12, 19-20 (1st Cir. 2004).

Although the Government need only show *one* occasion in which the Defendant exercised some authority or control over *one* other participant, as described in detail above, the evidence is clear that the Defendant exercised such control on *multiple* occasions.   On multiple occasions, Troche delivered drugs to the Defendant's customers at his behest.   *See United States v. Wright*, 695 Fed. Appx. 585, 590 (1st Cir. 2017) (upholding enhancement under § 3B1.1(b) where others conducted drug transactions at the defendant's behest); *see also United States v. Lopez*, 497 Fed. Appx. 687 (8th Cir. 2013) (upholding enhancement under § 3B1.1(b) where defendant took orders from customers and dispatched runners to deliver the drugs).   Troche also stored and packaged drugs at the request of and on behalf of the Defendant. *See United States v. White,* 270 Fed. Appx. 824, 837 (11th Cir. 2008) (upholding enhancement per § 3B1.1 where defendant utilized an individual as an "errand runner whose home was used for drug distribution and a currier); *see also*

*United States v. Nixon*, No. 11-0045-0017, 2013 WL 12171850, *1 (W.D. Penn. Feb. 2, 2013) (using a "runner" even infrequently and using a stash house triggers the management/supervisory role enhancement under § 3B1.1(b)).   In addition, as described in detail above, Troche drove the Defendant to multiple controlled purchases and acted as the lookout on two such occasions.   *See United States v. Lopez*, 431 F.3d 313, 316-318 (8th Cir. 2005) (upholding three-level enhancement per § 3B1.1 where defendant asked his roommate to serve as a lookout on one occasion); *see also United States v. Cole*, 657 F.3d 685, 687-688 (8th Cir. 2011) (upholding the adjustment where defendant had a co-defendant drive him to deliver drugs).

Moreover, the Defendant made numerous statements about having other people work for him; delivering drugs, testing drugs; and cooking powder cocaine into crack cocaine all to support his drug trafficking business.   The Defendant was also aware that a number of his customers sold at least a portion of the drugs they bought from him to their own customers.   *See United States v. Matthews*, 168 F.3d 1234, 1249-50 (11th Cir. 1999) (affirming role enhancement where the defendant sold cocaine to "runners" who, in turn, sold cocaine to buyers).   For example, on July 16, 2019, agents intercepted correspondence between the Defendant and Lucier, during which she was trying to get crack cocaine or "hard" from the Defendant.   During one intercepted call, the Defendant said he had someone cooking the cocaine for him, and LUCIER asked him if he could make "one" for her, and she stated, "cause I have a lot of sales, so I need to be able to go see someone else now."   Similarly, on July 23, 2019, agents intercepted a call between the Defendant and Lucier, during which she told the Defendant that she adds cut, or a diluting agent, to the drugs she buys from him before selling it to her customers ("No, I know… I fade it obviously").

Based on all of the foregoing, there is ample evidence to support a three-level upward adjustment for pursuant to § 3B1.1, and the Court should include the enhancement in determining the proper advisory guideline range for the Defendant.

Finally, based on his acceptance of responsibility, the Defendant is entitled to a three-level reduction, PSR ¶¶ 65-66, resulting in a total offense level is 32.   The Defendant has an extensive criminal history, and as a result, falls in criminal history category V.   PSR ¶¶ 69-81.   Based upon a total offense level of 32 and a criminal history category V, the advisory guideline range is 188-235 months.   PSR ¶ 129.

## III.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

### A.   <u>Nature of the Offense</u>

Law enforcement in the Fitchburg area have been familiar with the Defendant and his drug trafficking conduct for years.   Indeed, his criminal history includes two convictions for drug trafficking offenses, for which he was on probation at the time he committed the instant offenses. PSR ¶¶ 77-78, 80.   As described above, and throughout the offense conduct detailed in the PSR, the Defendant was a businessman who profited from the pain and addiction of others.   The Defendant was responsible for the distribution of a significant quantity of fentanyl, a dangerous and deadly controlled substance, that has contributed to a dramatic increase in overdose deaths in Massachusetts and nationwide.   Moreover, the Defendant sold to others who he knew—or in the case of CW-2 who he believed—were further distributing the narcotics he sold them to other people.[3]   The Defendant was not distributing the drugs to feed his own addiction; rather, he was

---

[3] For example, during his first meeting with CW-2, the Defendant told CW-2 that CW-2 could add cut ("whatever you want to chop it with") to the drugs, and the Defendant told CW-2 to let him know if CW-2's customers liked the product.   PSR ¶ 24.

distributing the drugs simply as a profit-making endeavor taking advantage of those individuals already suffering from addiction.   Indeed, during multiple recorded meetings between the Defendant and CW-2, the Defendant repeatedly spoke about how much money he made in the drug trade.   The results of such conduct—particularly when a drug like fentanyl is involved—can be catastrophic.

The danger of fentanyl is well-documented.   *See, e.g., United States v. Simms*, No. 1:19-CR-423, 2019 WL 7049930, *6 (N.D. Ohio Dec. 23, 2019) ("The distribution of fentanyl, one of the most deadly illegal drugs on the black market, poses an incredible threat to community members."); *United States v. Brown,* No. 17-00219-02, 2017 WL 4883375, *3 (W.D. Penn. Oct. 30, 2017) ("The Court is mindful that the distribution of fentanyl, in particular, has recently resulted in serious harm to the community—with multiple reports of overdoses and deaths resulting from that particular drug being reported in the news.").   Fentanyl is an extremely potent synthetic opioid that has become increasingly intertwined with heroin, both literally as an additive to make heroin more potent.[4]   More and more, drug traffickers in the Northeast are combining heroin and fentanyl due to fentanyl's greater potency and its lower cost.[5]   Indeed, in this case, every controlled purchase of "heroin" actually contained a mixture of fentanyl and heroin, with one exception when the substance only contained fentanyl.   PSR ¶¶ 15, 16, 19, 24, 27, 30, 33, 36,

---

[4]   U.S. Department of Justice Drug Enforcement Administration, *2019 National Drug Threat Assessment*, *available at*   https://www.dea.gov/sites/default/files/2020-01/2019-NDTA-final-01-14-2020_Low_Web-DIR-007-20_2019.pdf (last visited November 23, 2020) (hereinafter "DEA 2019 Assessment").

[5]   *Id.*   Numerous sources including the DEA 2019 Assessment point to the high frequency of fentanyl in toxicology screens of apparent heroin overdoses.   Overdoses involving drugs containing fentanyl more than doubled between 2015 and 2016.   *See, e.g., Dr. Hector Florimon, George Gillet, Deaths from drug overdoses continue to rise in the US, especially among blacks and Hispanics*, ABC News (March 29, 2018 1:49 PM ET), https://abcnews.go.com/Health/deaths-drug-overdoses-continue-rise-us-blacks-hispanics/story?id=54094943   (last visited November 23, 2020).

40, 44, and 46.

Overdose deaths resulting from synthetic opioids, chiefly fentanyl, rose from 19,413 deaths in 2016 to 28,466 deaths in 2017.[6]   Total opioid-related overdoses in 2017 topped out at 47,000 deaths.[7]   To place this figure more starkly, the 2018 data show that "every day, 128 people in the United States die after overdosing on opioids."[8]   This death rate has continued to rise, with fatal overdoses involving synthetic opioids, mainly fentanyl, increasing by 10% from 2017 to 2018.[9] Sadly, the COVID-19 pandemic appears to be making the opioid epidemic even worse.[10]   Recent reports indicate that overdoses have increased 30% to 40% during the pandemic, and health experts expect overdoses to continue to rise due to the pandemic.[11]   In addition, overdose fatalities have become more difficult to track amid the pandemic, because some communities are not currently performing autopsies.[12]

In Massachusetts, the situation is particularly acute, as the Commonwealth has been one of the states hardest hit by the opioid crisis and has been among the top ten states with the highest rates of opioid-related overdose deaths.   In both 2017 and 2018, Massachusetts was one of the top

---

[6] DEA 2019 Assessment at 13.

[7] National Institute on Drug Abuse, *Opioid Overdose Crisis, available at* https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis (last visited on November 23, 2020).
[8] *Id.*

[9] Holly Hedegaard et al., *Drug Overdose Deaths in the United States 1999-2018*, National Center for Health Statistics Data Brief, No. 356, 3 (January 2020), appearing at https://www.cdc.gov/nchs/data/databriefs/db356-h.pdf (last visited November 23, 2020).

[10] Jeremy Hobson and Samantha Raphelson, *Coronavirus Pandemic Compounds Another Ongoing Crisis: The Opioid Epidemic* (July 7, 2020), appearing at https://www.wbur.org/hereandnow/2020/07/07/coronavirus-opioid-abuse-crisis (last visited November 23, 2020).

[11] *Id.*

[12] *Id.*

five states with the highest rates of fentanyl-involved opioid overdose deaths. [13]   In 2018, Massachusetts had an opioid-related overdose death rate of 29.4 deaths per 100,000 persons, which was nearly twice the national rate of 14.6 deaths per 100,000 persons. [14]   While the increased availability of naloxone (also known as Narcan) has had a positive impact in lowering the number of overdose deaths in Massachusetts in 2018, there were still 2,003 confirmed opioid-related overdose deaths in Massachusetts and the Department of Public Health (DPH) estimates that there will be an additional 19 to 40 deaths confirmed for that year once all analysis is complete. [15]   For 2019, there were 1,967 confirmed opioid-related overdose deaths and DPH estimates that there will be an additional 39-68 confirmed deaths.   Among the 1,878 opioid-related overdose deaths in 2019 where a toxicology screen was also available, 1,749 of them (93%) had a positive screen result for fentanyl. [16]   In the first nine months of 2020, there were 1,141 confirmed opioid-related overdose deaths, however, preliminary data indicate that the real number is closer to 1,517 opioid-related deaths, which is estimated to be 33 more deaths compared with the first nine months of 2019. [17]

Moreover, the number of deaths involving prescription opioids declined in 2018, with

---

[13] *See* DEA 2019 Assessment at 14; *see also* National Institute on Drug Abuse, Opioid Summaries by State, *available at https://www.drugabuse.gov/drug-topics/opioids/opioid-summaries-by-state* (last visited November 23, 2020).

[14] National Institute on Drug Abuse, *Massachusetts: Opioid-Involved Deaths and Related Harms* (Revised April 3, 2020), *available at* https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/massachusetts-opioid-summary (last visited on November 23, 2020).

[15] Massachusetts Department of Public Health, *Data Brief: Opioid-Related Overdose Deaths Among Massachusetts Residents* (September 2020), *available at* https://www.mass.gov/doc/opioid-related-overdose-deaths-among-ma-residents-november-2020/download (last visited November 23, 2020).

[16] *Id.*

[17] *Id.*

Massachusetts providers being among the lowest prescribing rates in the country, while the number of deaths involving synthetic opioids continued to rise.[18]   These data indicate that the illegal street sale of illicit synthetic opioids, such as fentanyl, is the overwhelming cause of overdose deaths.

These statistics are not hypothetical: they describe the situation occurring right now in this district.   Behind each statistic is someone's mother, father, child, brother, sister, or friend.   The epidemic is real and being felt every day by families across Massachusetts.   These facts are relevant to this case, of course, because the quantity of fentanyl distributed by the Defendant and his co-conspirators have contributed to this devastation in the Commonwealth.[19]

### B.  Characteristics of the Defendant

The Defendant is 32 years old.   PSR ¶ 94.   He is a United States citizen, who lived in Fitchburg, Massachusetts for most of his life.   *Id.*   The Defendant has four biological children from three different women, and three additional children who he views as his stepchildren with two of those three women.   PSR ¶¶ 102-105.   Prior to his arrest in this case, the Defendant's mother had custody of three of his biological children and one child who the Defendant identifies as a stepchild.   PSR ¶ 98.   The Defendant currently owes nearly $40,000 in unpaid child support. PSR ¶ 106.   The Defendant asserts that "[b]y all reports he is a good father" (Dkt. 663)—the facts clearly contradict that assertion.

---

[18] *See* National Institute on Drug Abuse, *Massachusetts: Opioid-Involved Deaths and Related Harms* (Revised April 3, 2020), *available at* https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/massachusetts-opioid-summary (last visited on November 23, 2020).

[19] Fentanyl can be lethal in doses as small as 2 milligrams.   In this case, the Defendant is alleged to have distributed over 1.67 kilograms of a fentanyl/heroin mixture.   Thus, depending upon how the fentanyl associated with the Defendant had been distributed, the drugs could have been responsible for the deaths of more than 835,000 individuals.   Indeed, the evidence indicates that the Defendant's father and co-conspirator Pedro sold a fentanyl/heroin mixture that caused at least one overdose death.

The Defendant does not report any major medical, mental health, or substance abuse issues. PSR ¶¶ 108-115.   Though the Defendant reported historical use of cocaine—which he says ended in mid-2019—he does not claim that he sold narcotics to support his own addiction.   PSR ¶ 113.

It has been nearly a decade since the Defendant has had steady employment.   PSR ¶¶ 121-122.   Rather, it appears he has spent the last ten years—his entire adult life—engaged in criminal activities.   PSR ¶¶ 70-92.   Indeed, between the ages of 23 and 30 years old, the Defendant was convicted of at least one offense each year.   PSR ¶¶ 72-78.   Those convictions include drug trafficking offenses, firearms offenses, as well as a conviction for assault and battery.[20]   PSR ¶¶ 72 (firearms offenses), 73-74, 77-78 (drug offenses), 75 (assault and battery).

## C.  Specific and General Deterrence

A significant sentence of imprisonment is warranted to deter others from becoming involved in trafficking of fentanyl as the dangers associated with this deadly drug cannot be overstated.   Individuals tempted to engage in drug trafficking must understand that *any* involvement with fentanyl will have immediate and harsh consequences.   A significant term of imprisonment is necessary to send a strong warning to others who might otherwise consider profiting from this deadly drug that they must resist the temptation.   Further, general deterrence must be considered for any other individuals similar to the Defendant's status, that drug distribution is not a gainful way of life.

---

[20] The mother of two of his biological children and one of his stepchildren was the victim in the offense described in paragraph 75, and is the alleged victim described in paragraphs 88-89 of the PSR.   PSR ¶ 104. According to a Leominster Police Department report, on April 15, 2015, the Defendant struck his former girlfriend with the back of his hand.   PSR ¶ 75.   The report also states that the Defendant strangled the victim, leaving visible marks around her neck.   *Id.*

This is particularly true in this case.   The Defendant was not distributing the drugs to feed his own addiction; rather, he was distributing the drugs simply as a profit-making endeavor taking advantage of those individuals already suffering from addiction.   The results of such conduct—particularly when a drug like fentanyl is involved—can be catastrophic.

Imprisonment is necessary to send a strong warning to others who might otherwise consider involvement with this dangerous drug that they must resist the temptation.   Any sentence below the advisory guideline range would be inadequate to send such a message.   A significant sentence is warranted both to punish the Defendant and to dissuade others from continuing to distribute drugs that are killing tens of thousands of individuals nationwide.   Simply put, lives are at stake.

Considerations of specific deterrence also support imposition of a substantial term of incarceration.   The Defendant has lived his entire adult life engaged in criminal conduct, including drug trafficking.   Despite his prior convictions, and periods of incarceration, the Defendant continued to commit the *same* offenses.   Indeed, he was on probation for two prior convictions for drug trafficking offenses when he committed the instant drug trafficking offenses.   PSR ¶¶ 77-78, 80.   The sentence recommended by the Government would send the message that continued criminal behavior will be met with serious consequences, and such a sentence will hopefully be sufficient to deter the Defendant from resuming a life of drug distribution.

## IV.   CONCLUSION

Consistent with the factors set forth in § 3553(a), and the sentencing guidelines, the Government respectfully recommends that the Defendant, Anthony Baez, be sentenced to a term of incarceration of 188 months, the bottom of the advisory GSR, followed by five years of supervised release as required by 21 U.S.C. § 841(b).   The Government further requests that the

Court order the Defendant to pay a special assessment of $700.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By:     */s/ Alathea E. Porter*
Alathea E. Porter
Assistant U.S. Attorney

Date:   November 25, 2019



**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

*/s/ Alathea E. Porter*
ALATHEA E. PORTER
Assistant United States Attorney


Date: November 25, 2020